ROGER REESE, Plaintiff-Appellant, v. FORSYTHE MERGERS GROUP, INC., *et al.*, Defendants-Appellees (Glen Marino *et al.*, Defendants).

Second District    No. 2—96—1144

Opinion filed June 20, 1997.

David L. Martenson, of Martenson, Greenlee & Kreitlow, of Rockford, for appellant.

William C. Murphy and Matthew J. Herman, both of Murphy, Hupp, Foote, Mielke & Kinnally, of Aurora, for appellees.

JUSTICE COLWELL delivered the opinion of the court:

Plaintiff, Roger Reese, appeals from the trial court's order granting the defendants' motion for summary judgment pursuant to counts

I, III, and IV of his complaint and the court's granting the defendants' section 2—619 motion (735 ILCS 5/2—619 (West 1994)) to dismiss pursuant to count V of his complaint. The trial court determined that a binding agreement did not exist between Reese and the defendants and that the alleged partial performance by the parties was insufficient to take any oral agreement out of the statute of frauds (740 ILCS 80/1 *et seq.* (West 1994)). Further, the trial court found that there was no factual basis to support Reese's allegations that a fiduciary duty existed between defendant Gerald Forsythe and himself. On appeal, Reese contends that the trial court's ruling is erroneous because a genuine issue of material fact exists regarding each of the counts in his complaint. We affirm.

The parties in this action were involved in an investment project that never materialized. The record shows that Reese knew Guy Courtney, an employee of Barron Chase Securities and president of the Machaira Group, Inc. (TMG), through Reese's investments in TMG. Courtney knew defendant Gerald Forsythe through Forsythe's investments in TMG. Late in 1993, Courtney met with Forsythe to discuss the formation of a "blank check" company. The purpose of the company was to fund an acquisition of a financial institution. Forsythe stated that he would be interested in investing "if the proper people could be put together." The blank check company became known as Forsythe Mergers Group (FMG).

Thereafter, Courtney met with Reese about his possible investment and participation in FMG. Reese was the president and CEO of Market Dimensions, Inc. (MDI), as well as an employee. As an MDI employee, Reese consulted with banks relative to market research issues and provided computer services to these banks and savings and loans institutions. Reese also had experience with initial public offerings (IPOs) similar to the one planned for FMG because he had put together an IPO while working for Amcore Financial in 1986. During the period that he was involved with FMG, Reese remained employed with MDI.

At the meeting, Reese and Courtney discussed FMG and the IPO. Reese testified in a deposition that he and Courtney orally agreed that Reese would be "a principal of Forsythe Mergers Group, *** assuming [Forsythe] would approve the deal." Reese said that he was told more than once that the entire deal depended upon Forsythe's approving the deal and his signing onto it.

Reese began working on the project. He reviewed prospectuses of two other deals similar to the one that FMG was attempting to complete, wrote a report after researching the pricing of banks and recent transactions, and provided projections concerning FMG based upon other similarly typed companies.

Meanwhile, Courtney forwarded Reese's résumé to Forsythe. Forsythe informed Courtney to go forward with the deal. Subsequently, early in March 1994, Courtney contacted Reese and told him that Forsythe had seen Reese's résumé and that the "deal was a go" with the next step being for Reese to meet Forsythe.

In April 1994 Reese met with Courtney and Bob Kirk, president of Barron Chase Securities, in Courtney's office to discuss the concept of the transaction and how Courtney and Kirk would be involved. After the meeting, Reese, Courtney, and Kirk went to Forsythe's office, where Reese met Forsythe for the first time. Reese had never talked with Forsythe or received any written communication from him prior to the meeting.

At the meeting, Reese, Courtney, and Forsythe discussed the general structure of the IPO and FMG and some generalities concerning the stock/share agreement. For example, the parties discussed that the price range of the stock to be offered to the public would be between $5 and $6. Forsythe repeated that the deal was a "go" at the end of the meeting.

Reese testified that, between a few days and two weeks after the meeting took place, he and Forsythe made contributions in FMG. On June 6, 1994, FMG was incorporated in Nevada as a start-up entity to conduct the proposed offering. Reese stated that "[a]s president of Forsythe Mergers Group, [he] established a bank account and deposited [the money] into it." Reese contributed $20,176.47 and Forsythe contributed $21,000. Reese said that he did not know if anyone aside from himself was the signatory power on the bank account.

Reese testified that, although Forsythe said the deal was a "go" in April, Reese understood that several things had to be accomplished before things "became a done deal." Specifically, Reese explained that the Securities and Exchange Commission (SEC) had to approve the registration statement, there had to be a public offering of the stock, and the stock had to be sold.

Reese added, however, that the point at which the actual consummation of an IPO occurred could be interpreted many ways, such as when the filing of the registration statement occurred, when the SEC's approval was received, or when the underwriters' agreement was finalized. Although Reese acknowledged that none of these things were ever accomplished, Reese testified that to him the IPO was consummated upon depositing his and Forsythe's money in the FMG bank account. Later in his deposition, however, Reese admitted that Courtney told him that it was only after Forsythe "signed on" that the investment was a "done deal."

In his deposition, Forsythe testified that, when he first met Reese

in April, Reese made him feel uncomfortable. After the meeting with Courtney and Reese, Forsythe telephoned an employee, Arnold Becker, to complete a background check on Reese. Forsythe said that he did not remember the specifics of his conversation with Becker, but, upon speaking with Becker after Becker's background check, Forsythe told Courtney that he did not want to proceed with Reese. Thereafter, Courtney called Reese.

Around June 15, 1994, approximately two weeks after the incorporation of FMG, Reese received notice, by telephone, from Courtney that he was no longer in the deal. Reese testified that after the April meeting he had begun working on the registration statement and that the only things remaining on it when he received Courtney's notice were the "accountant's report and opinion" and the attorney's opinion "as it relate[d] to the legality of the stock issue." Reese then added that the draft of the statement needed "more polishing" and also that an employment agreement had not yet been entered between him and FMG in written form.

Regarding the employment agreement, Reese stated that prior to June 15 he had discussed the terms of the agreement with Courtney. Reese said that he and Steve Kroll, an attorney for FMG, structured the employment agreement to be similar to an agreement used with another company in a merger deal. Reese stated that he and Courtney met Kroll on the same day as the day of the April meeting with Forsythe and that he later requested Courtney to obtain the contract upon which they were going to base Reese's employment agreement. Reese explained that he made several drafts of the employment agreement and sent each successive draft to Kroll and Courtney.

Reese stated that as president of FMG he had final approval of his employment agreement but that he never would have implemented it until or unless Forsythe approved it. Reese explained that no one ever signed the employment agreement but that the terms of the employment agreement had been discussed and agreed upon between him and Courtney.

Reese testified that he did not send any copies of the agreement to Forsythe and that Courtney told him that he would serve as the go-between for Reese and Forsythe regarding all matters relating to the corporation. Reese said that no one else ever told him that all communication with Forsythe would take place through Courtney and that Courtney never indicated to him that he had the authority to speak for Forsythe. Reese added, however, that as things went along "it was very clear in [his] mind" that Courtney was speaking for Forsythe. In his deposition, Courtney acknowledged that, because access to Forsythe could be difficult and because he had the acces-

sibility to Forsythe based on his prior relationship with him, he may have told Reese to deal strictly with him and not go through Forsythe.

Upon hearing from Courtney that Forsythe did not want him in the deal anymore, Reese asked Courtney whether the deal was going to go through without him. Courtney replied that he was not positive. Reese said that his conversation with Courtney was relatively short but that Courtney may have told him that he was going to try to get Reese's money back for him. Reese said that a couple of weeks later he received a check for $21,176.47, an amount equal to his remaining stake in the offering. We note that Courtney testified that Reese called him and told him the amount of money owed to Reese on the FMG deal and that he issued the check in response to Reese's request. In any event, after receiving the check, Reese deposited it into his account.

In a letter dated June 20, 1994, Reese explained to Courtney the amount of work he performed to incorporate FMG. The letter states that Reese believed that he should be compensated for his work in the same manner as if FMG had been a client of MDI. At the end of the letter, Reese computes his costs and expenses as $4,922.78. We note that in his deposition Reese testified that he was aware that FMG's lawyers were not going to be paid for their legal services unless the IPO was consummated. Reese stated that he believed that the arrangement was fair.

Reese received a response from Courtney in July. A "release of liability" accompanied the letter and stated that Reese's costs and expenses would be paid in exchange for Reese's release of any claim of liability. Reese called Courtney and told him that he was not going to sign anything. Reese stated that he believed that it was about that time that he learned that the deal was going to go ahead without him. Reese said that not being a part of the deal angered him and at that point he sought counsel.

Courtney's deposition testimony mirrored Reese's in nearly all material aspects. Courtney added, however, that, within a few hours after Reese's initial meeting with Forsythe, Forsythe called Courtney and told him that he did not have a good feeling about Reese. Courtney stated that after Reese was gone from the deal his responsibilities included finding someone else with whom Forsythe would conduct business. Courtney said that Reese's replacement was Glen Marino and that, after Forsythe bought Reese's stock back from him, Forsythe sold part of it to Marino. Courtney added that, subsequent to Forsythe's selling stock to Marino, Forsythe decided to terminate the deal.

Forsythe testified to his perspective of the FMG deal. Forsythe stated that it was always his intention to go through with the deal as long as the right people were attached. Forsythe said that he was uncomfortable with Reese and that was why he told Courtney that he did not want Reese to become a part of FMG.

Forsythe stated that he met Courtney's replacement for Reese, Marino, after he terminated the process with Reese. Thereafter, however, he called Courtney and told him to put "on hold any effort" on FMG. Forsythe explained that at that time he was involved in another offering and had been advised that it would not be good to have his name in the public in two transactions at the same time. Finally, Forsythe stated that he had no intention of starting the process again for FMG.

Reese filed a four-count complaint against FMG, Forsythe, Courtney, Marino, and TMG. Count I requested a judgment for specific performance based upon the partial oral and written agreements of the parties. Count II is not at issue in this appeal. Counts III and IV alleged, respectively, that Forsythe and FMG breached the employment agreement between Reese and FMG. Finally, Reese later amended his complaint to include count V, which alleged that Forsythe breached a fiduciary duty. We note that the court dismissed without prejudice TMG, Marino, and Courtney from Reese's complaint.

The remaining defendants filed a motion for summary judgment concerning counts I, III, and IV of Reese's complaint, as well as a motion to dismiss count V. The trial court granted all of the defendants' motions. On appeal, Reese contends that the trial court's rulings were erroneous because an issue of material fact exists regarding each of the counts.

■ We turn first to whether the trial court properly granted the defendants' motions for summary judgment. Summary judgment is appropriate only when the pleadings, depositions, and admissions on file, together with the affidavits, if any, disclose that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Bolingbrook Equity I Ltd. Partnership v. Zayre of Illinois, Inc.*, 252 Ill. App. 3d 753, 764 (1993). While plaintiffs need not prove their cases at the summary judgment stage, they must come forward with some facts that would arguably entitle them to judgment. *Jones v. Minster*, 261 Ill. App. 3d 1056, 1059 (1994). Indeed, summary judgment is a drastic measure and should be granted only if the movant's right to judgment is clear and free from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). Therefore, where a reasonable person can draw

divergent inferences from undisputed facts, summary judgment should be denied. *Outboard*, 154 Ill. 2d at 102. Finally, our review of the trial court's entry of summary judgment is *de novo*. *Monticello Insurance Co. v. Wil-Freds Construction, Inc.*, 277 Ill. App. 3d 697, 701 (1996).

Counts I, III, and IV of Reese's complaint depend upon a finding that a valid contract existed between Reese and the defendants. Accordingly, before this court discusses whether specific performance could have been granted regarding count I and whether FMG or Forsythe breached the contract as counts III and IV allege, we will address whether the record raises a factual question regarding the existence of a valid contract between the parties.

Reese contends that the parties entered into an enforceable contract when they incorporated FMG in Nevada, deposited their funds in a FMG bank account, and agreed to "the tasks to be performed." Further, Reese argues that, although the employment agreement was never signed by any party, the terms in it were agreed upon by Courtney and Forsythe, and, therefore, the employment agreement, along with the oral agreement to go forward with the deal, constituted a contract. We disagree.

■ Overall, a party seeking to enforce an agreement has the burden of establishing the existence of the agreement. *Commonwealth Edison Co. v. Industrial Comm'n*, 167 Ill. App. 3d 229, 233 (1988). To form a valid contract between two parties, there must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting. *Commonwealth Edison*, 167 Ill. App. 3d at 233. Accordingly, when determining whether an enforceable contract exists, we must look at the intent of the parties, as evidenced by the language in the document. *Bradley Real Estate Trust v. Dolan Associates Ltd.*, 266 Ill. App. 3d 709, 712 (1994). Further, oral contracts are proved not only by what the parties have said, but also by what they have done. See *In re Marriage of Sherrick*, 214 Ill. App. 3d 92, 95 (1991).

■ We note that the existence of a contract is generally a question reserved for the trier of fact. *Yorke v. B.F. Goodrich Co.*, 130 Ill. App. 3d 220, 222-23 (1985). Where the facts are not in dispute, however, the existence of a contract is a question of law, which the trial court may decide on a motion for summary judgment and which this court may independently review. *Lewis-Connelly v. Board of Education of Deerfield Public Schools, District 109*, 277 Ill. App. 3d 554, 557 (1996).

■ We find that the record in this case demonstrates that a contract did not exist between Reese and the defendants. Indeed,

Reese argues that an agreement existed but avoids the pertinent issue of explaining to what the parties agreed. It is unclear from Reese's brief and complaint what he believes exactly the "agreement" with the defendants entails.

Turning to the employment agreement, Reese acknowledges that the agreement was never signed by himself or Forsythe. Reese even admits that he did not know whether Forsythe knew about the employment agreement that Reese was drafting for himself. Further, Reese stated that, although he was president of FMG, he would not adopt the employment agreement without Forsythe's approval. Finally, we note that the employment agreement never got out of the drafting stage. In his June 20, 1994, letter, Reese states that a "model" employment contract is in place and the employment agreement enclosed in the record is stamped with the word "draft." We cannot say that such an agreement constitutes a contract that is binding upon Reese and the defendants. Instead, the undisputed facts demonstrate that the agreement was never executed.

Reese places extreme emphasis on Forsythe's stating that the deal was a "go" at the April meeting. Reese contends that this comment created an oral contract between both parties regardless of the employment agreement's not being signed. Again, we note that Reese does not explain exactly what the agreement is; he simply contends that a contract was formed when Forsythe said the deal was a "go" and then deposited money in the bank in FMG's name after FMG was incorporated. We decline to find that these acts formed a valid contract.

For a valid contract to be formed, an " 'offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain.' " *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29 (1991), quoting 1 W. Jaeger, Williston on Contracts §§ 38 through 48 (3d ed. 1957); 1 A. Corbin, Corbin on Contracts §§ 95 through 100 (1963). A contract is " 'sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof *** to ascertain what the parties have agreed to do.' " *Academy Chicago Publishers*, 144 Ill. 2d at 29, quoting *Morey v. Hoffman*, 12 Ill. 2d 125, 131 (1957). While it is true that a contract may be enforced if some contract terms are missing, if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract. *Champaign National Bank v. Landers Seed Co.*, 165 Ill. App. 3d 1090, 1093 (1988).

We find that Forsythe's stating that the deal is a "go" lacks the

definite and certain essential items required for the formation of an oral contract. First, we reiterate that this court is unclear as to what the agreement is that Reese refers to as being formed. Consequently, because it is unclear what Reese and the defendants have agreed to do, there is no enforceable contract. See *Academy Chicago Publishers*, 144 Ill. 2d at 29.

Indeed, the only definite thing that the actions of Reese and the defendants show is that the parties agreed that Courtney's project was a deal in which both were interested. In other words, the facts demonstrate merely that Reese and Forsythe were two investors who were interested in a particular project. Courtney had an idea to form a blank check company for which his company, TMG, could serve as underwriter. Courtney approached Forsythe, as Forsythe had investments with TMG. Forsythe told Courtney that he was interested if the right people were involved. Next, Courtney approached another TMG investor, Reese. Reese also wanted to be involved in the deal and Courtney and Reese agreed that, if Forsythe approved and "signed on" the deal, Reese would be a principal of the new company formed, FMG. As Reese acknowledged, however, his participation in the deal depended on Forsythe. There would not be any deal if Forsythe was not interested in it or, as Forsythe stated in his first meeting with Courtney, if the right people were not involved.

That Forsythe stated that the deal was a "go" does not change these conditions. Indeed, Reese acknowledges that meeting Forsythe was a "step" in putting the deal together and that several things had to be completed before things were a "done deal." It is undisputed that not one of these things was accomplished before Forsythe informed Courtney that he did not want to work with Reese.

Further, even if Forsythe's stating that the deal was a "go" did constitute an agreement, there are too many undetermined essential elements concerning the agreement for it to be enforceable. Although our list is certainly not exhaustive, we note the following contingencies concerning the parties' alleged "agreement." First, although a draft existed, Reese's employment contract had not been executed. Second, a price for the shares had yet to be agreed upon, and Reese even admitted at one point in his deposition that he was unsure whether he and Forsythe discussed the share price at the April meeting. Third, although Reese had completed preliminary research on the market, a "target" company for acquisition had not been decided upon, and at the April meeting Forsythe and Reese merely discussed the "potential market for target companies." Finally, there is no record of any discussion concerning the overall timetable regarding the entire deal, when the stock would be offered, what would happen if a

"target" company was not found, or even what each party's responsibilities were. Consequently, even if an oral agreement was reached, it was too indefinite to serve as a valid and enforceable contract. See *Champaign*, 165 Ill. App. 3d at 1094 (alleged agreement must contain sufficient definitiveness to be enforceable).

In light of our decision that there is no valid and enforceable contract between the parties, we need not address whether specific performance could have been granted or whether Forsythe and FMG breached the contract. Accordingly, we turn next to whether the trial court properly dismissed count V of Reese's complaint.

■ A motion to dismiss under section 2—619 of the Code of Civil Procedure admits all well-pleaded facts. *Geick v. Kay*, 236 Ill. App. 3d 868, 874 (1992). The purpose of a section 2—619 motion is to provide a mechanism to dispose of issues of law or easily proved issues of fact, and the cause of action should not be dismissed on the pleadings unless it is apparent that no set of facts can be proved that will entitle a plaintiff to recover. *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 473 (1990). While appellate review of the dismissal of a complaint pursuant to a section 2—619 motion is limited to a consideration of the legal questions presented by the pleadings, our review is independent and we need not defer to the trial court's reasoning. *Miranda v. Jewel Cos.*, 192 Ill. App. 3d 586, 588 (1989).

■ Reese contends that as shareholders of FMG he and Forsythe had a fiduciary duty toward each other. In support of his argument, Reese relies on this court's decision in *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60 (1990). In *Hagshenas*, the parties, the Gaylords and the Hagshenases, formed a close corporation and served as officers and directors of the corporation, with each party being a 50% shareholder. Thereafter, one of the parties, Bruce and Barbara Hagshenas, resigned from the corporation. The following day, the Hagshenases purchased a new agency, hired the prior corporation's employees, and began directly competing with the prior corporation. Each party filed a complaint and the Gaylords alleged that the Hagshenases breached a fiduciary duty. *Hagshenas*, 199 Ill. App. 3d at 63.

The *Hagshenas* court found that, because the corporation was a close corporation operated similarly to a partnership, both parties were 50% shareholders, and both parties served as directors and officers that oversaw the day-to-day operations of the corporation, each party owed a fiduciary duty to the other. The court explained that the Hagshenases owed a fiduciary duty similar to a partner to the Gaylords and violated this duty by opening a competing business and hiring away all the corporation's employees, who were of "great significance" to the corporation's success. *Hagshenas*, 199 Ill. App. 3d at 71.

We find *Hagshenas* inapplicable to the present case. First, it is undisputed that, contrary to the close corporation in *Hagshenas,* FMG was to be a publicly traded corporation, with possibly over 1 million shares being offered to the public. Second, the relationship between Reese and Forsythe is drastically different from the relationship between the parties in *Hagshenas*. Here, Reese and Forsythe met only once to discuss the generalities of the project. Reese even admits that the April meeting was the only time he *ever* communicated with Forsythe. Accordingly, the relationship between Forsythe and Reese does not even begin to equate with the close relationship the Gaylords had with the Hagshenases regarding their corporation.

Finally, there is no evidence that Forsythe did anything to compete with FMG. From the beginning, Forsythe stated that he would be interested in investing in Courtney's project if the right people were involved. Later, Forsythe changed his mind and decided not to invest. We note this decision came *after* Reese was no longer with the project. Further, there is no evidence that the "other" transaction that Forsythe was involved with was in competition with FMG or a business opportunity available to FMG. On the contrary, this other transaction involved electric-power generation plants, not financial institutions.

Therefore, we find that the *Hagshenas* case is distinguishable from the case at bar and no fiduciary duty existed between Reese and Forsythe. Instead, we find that the facts show that two investors formed a corporation for the purpose of creating an investment project, and, one of those investors, Reese, took the initiative to set up the preliminary groundwork for the project. Indeed, the record shows that Reese began to work on the project immediately after talking to Courtney in 1993. Reese testified that after the meeting with Courtney he spent numerous hours reviewing similar transactions and researching possible candidates for the FMG acquisition. Reese accomplished all this work before he even met Forsythe, even though he knew that without Forsythe's approval there would not be any deal. After meeting with Forsythe and hearing that Forsythe was interested, Reese continued completing the preliminary work. That Reese continued working on the project, however, does not mean that a contract had been formed. Similarly, that Forsythe decided not to work with Reese and not to invest in the project does not mean that a fiduciary relationship existed or that a breach occurred. Instead, the facts show only that Forsythe, an investor, decided not to invest in Courtney's project with Reese and later decided not to invest in the project at all.

In conclusion, we find that no genuine issues of material fact exist regarding counts I, III, and IV of the plaintiff's complaint. Further, we find that the trial court's order granting the defendants' motion to dismiss regarding count V was not erroneous.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

BOWMAN and DOYLE, JJ., concur.